UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

WILLIAM T. SMITH,

                     Mr. Smith,

     v.

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,

                Defendant.

Case No. 3:16-cv-05480-TLF

ORDER AFFIRMING
DEFENDANT'S DECISION TO
DENY BENEFITS

       William T. Smith has brought this matter for judicial review of defendant's denial of his applications for disability insurance and supplemental security income (SSI) benefits. The parties have consented to have this matter heard by the undersigned Magistrate Judge. 28 U.S.C. § 636(c), Federal Rule of Civil Procedure 73; Local Rule MJR 13. For the reasons set forth below, the Court finds that defendant's decision to deny benefits should be affirmed.

<u>INTRODUCTION</u>

       In November 2005, Mr. Smith filed an application for disability insurance benefits and another one for SSI benefits, alleging in both applications that he became disabled beginning March 10, 2005. Dkt. 9, Administrative Record (AR) 565. Both applications were denied on initial administrative review and on reconsideration. *Id.* A hearing was held in August 2008 before an administrative law judge (ALJ). AR 565. Mr. Smith appeared and testified as did a

ORDER - 1

medical expert and a vocational expert. AR 22-64. The ALJ found in a written decision that Mr. Smith was not disabled. AR 11-21. On review, this court reversed and remanded that ALJ's decision. *See* AR 718. Another hearing was held in September 2013 before a different ALJ; Mr. Smith testified by telephone. AR 565, 605.[1]

In a written decision on December 13, 2013, the ALJ found that Mr. Smith could perform his past relevant work and therefore was not disabled. AR 565-592. The Appeals Council denied Mr. Smith's request for review on April 11, 2016, making the ALJ's decision the final decision of the Commissioner, which Mr. Smith then appealed in a complaint filed with this Court on June 15, 2016. AR 555-60; Dkt. 3; 20 C.F.R. §§ 404.981, 416.1481.

Mr. Smith seeks reversal of the ALJ's decision and remand for an award of benefits, arguing the ALJ erred:

    (1)    in evaluating the medical evidence;

    (2)    in discounting Mr. Smith's credibility;

    (3)    in rejecting the lay witness evidence; and

    (4)    in assessing Mr. Smith's residual functional capacity.

For the reasons set forth below, however, the Court disagrees that the ALJ erred as alleged, and therefore recommends that the Court affirm the decision to deny benefits.

## DISCUSSION

The Commissioner employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920. If the ALJ finds the claimant disabled or not disabled at any particular step, the ALJ makes the disability determination at that step and the sequential evaluation process ends. *See* 20 C.F.R. §§ 404.1520, 416.920. At issue

---

[1] The record contains only a partial transcript of the hearing. *See* AR 628.

here is the ALJ's evaluation of the medical evidence and testimony from Mr. Smith and his lay witnesses, the ALJ's use of that evidence in assessing Mr. Smith's RFC, and the ALJ's resulting conclusion at step five that Mr. Smith could perform jobs existing in significant numbers in the national economy.

This Court must uphold the Commissioner's determination that a claimant is not disabled if the Commissioner applied the "proper legal standards" and the "substantial evidence in the record as a whole supports" that determination. *Hoffman v. Heckler*, 785 F.2d 1423, 1425 (9th Cir. 1986); *see also Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004); *Carr v. Sullivan*, 772 F. Supp. 522, 525 (E.D. Wash. 1991). "A decision supported by substantial evidence nevertheless will be set aside if the proper legal standards were not applied in weighing the evidence and making the decision." *Carr*, 772 F. Supp. at 525 (citing *Brawner v. Sec'y of Health and Human Sers.*, 839 F.2d 432, 433 (9th Cir. 1987)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *see also Batson*, 359 F.3d at 1193.

This Court will uphold the Commissioner's findings "if supported by inferences reasonably drawn from the record." *Batson*, 359 F.3d at 1193. Substantial evidence requires the Court to determine whether the Commissioner's determination is "supported by more than a scintilla of evidence, although less than a preponderance of the evidence is required." *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975). "If the evidence admits of more than one rational interpretation," the Court must uphold that decision. *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). That is, "[w]here there is conflicting evidence sufficient to support either

outcome," the Court "must affirm the decision actually made." *Allen*, 749 F.2d at 579 (quoting *Rhinehart v. Finch*, 438 F.2d 920, 921 (9th Cir. 1971)).

I.    The ALJ's Evaluation of the Medical and Other Opinion Evidence

The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the medical evidence. *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998). Where the evidence is inconclusive, "'questions of credibility and resolution of conflicts are functions solely of the [ALJ]'" and this Court will uphold those conclusions. *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982) (quoting *Waters v. Gardner*, 452 F.2d 855, 858 n. 7 (9th Cir.1971)); *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 601 (9th Cir. 1999). As part of this discretion, the ALJ determines whether inconsistencies in the evidence "are material (or are in fact inconsistencies at all) and whether certain factors are relevant" in deciding how to weigh medical opinions. *Id.* at 603.

The ALJ must support his or her findings with "specific, cogent reasons." *Reddick*, 157 F.3d at 725. To do so, the ALJ sets out "a detailed and thorough summary of the facts and conflicting clinical evidence," interprets that evidence, and makes findings. *Id.* The ALJ does not need to discuss all the evidence the parties present but must explain the rejection of "significant probative evidence." *Vincent on Behalf of Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984) (citation omitted). The ALJ may draw inferences "logically flowing from the evidence." *Sample*, 694 F.2d at 642. And the Court itself may draw "specific and legitimate inferences from the ALJ's opinion." *Magallanes v. Bowen*, 881 F.2d 747, 755 (9th Cir. 1989).

In general, the ALJ gives more weight to a treating physician's opinion than to the opinions of physicians who do not treat the claimant. *See Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). Nonetheless, an ALJ need not accept a treating physician's opinions that "is brief, conclusory, and inadequately supported by clinical findings" or "by the record as a whole."

ORDER - 4

*Batson*, 359 F.3d at 1195; *see also Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002); *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001).

To reject the uncontradicted opinion of either a treating or examining physician, an ALJ must provide "clear and convincing" reasons. *Lester*, 81 F.3d at 830. When other evidence contradicts the treating or examining physician's opinion, the ALJ must still provide "specific and legitimate reasons" to reject that opinion. *Id.* at 830-31. In either case, the ALJ's reasons must be supported by substantial evidence in the record. *Id.* Next, an ALJ gives greater weight to an examining physician's opinion than that of a nonexamining physician. *Id.* at 830. Finally, a non-examining physician's opinion may constitute substantial evidence for an ALJ's findings if that opinion "is consistent with other independent evidence in the record." *Tonapetyan*, 242 F.3d at 1149.

Mr. Smith contends that the ALJ committed numerous errors in considering, or failing to consider, medical opinion evidence dating back to 2005. However, many of Mr. Smith's arguments consist of one-sentence, conclusory assertions. *See, e.g.*, Dkt. 22, pp. 5 ("These are not legitimate reasons to reject Dr. Brown's opinion"), 11 "(The ALJ's analysis is not supported by substantial evidence, and none of the ALJ's reasons are legitimate reasons to reject Dr. Sanchez's opinion"), 12 ("The ALJ's assertion is not supported by substantial evidence"). This court will not address issues that a party does not argue with specificity in its briefing. *Carmickle v. Commissioner of Social Sec. Admin.*, 533 F.3d 1155, 1161 n.2 (9th Cir. 2008); *see Paladin Associates., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1164 (9th Cir. 2003) (by failing to make argument in opening brief, objection to grant of summary judgment was waived); *Kim v. Kang*, 154 F.3d 996, 1000 (9th Cir. 1998) (matters not specifically and distinctly argued in opening brief ordinarily will not be considered).

1     This Court has considered Mr. Smith's arguments to the extent it can discern them.

2  Nonetheless, in making only passing, conclusory assertions Mr. Smith waived his arguments that

3  the ALJ erred in considering the opinions of Dr. Brown, Dr. Sanchez, Dr. Neims, Dr. Smith, Dr.

4  Redick, Dr. Johnson, Dr. Lee, and Dr. Hilby. *See* Dkt. 22, pp. 4-5, 10-12, 14-17. Mr. Smith

5  likewise failed to present a specific argument that the ALJ erred in considering his various global

6  assessment of functioning (GAF) scores. Dkt. 22, p. 17. The Court therefore addresses only the

7  arguments that Mr. Smith supported with some specificity.

8     A.    <u>Dr. Stagner</u>

9     Ted Stagner, Psy.D., opined that Mr. Smith was acutely mentally ill in October 2005. AR

10  318-20. He opined that Mr. Smith was markedly limited in his ability to learn new tasks, exercise

11  judgment and make decisions, relate appropriately to coworkers and supervisors, interact

12  appropriately in public contacts, and respond appropriately to and tolerate the pressures and

13  expectations of a normal work setting. AR 319.

14     The ALJ gave "little weight" to Dr. Stagner's opinion. He explained that Dr. Stagner

15  gave his opinion "shortly after [Mr. Smith] experienced an episode of decompensation." AR 583.

16  Whereas Mr. Smith's condition tended to worsen when he was off medications or drinking

17  alcohol, the ALJ noted that such episodes were "only temporary" and became better with

18  medication. AR 577. The ALJ observed that later clinical observations were inconsistent with the

19  degree of limitations that Dr. Stagner assessed. AR 583; *see* AR 576. And the ALJ explained that

20  Dr. Stagner's opinion regarding Mr. Smith's limitations was inconsistent with Mr. Smith's

21  activities (part-time work, meetings, driving, chess, "going bowling," and "going to fairs"). AR

22  583; *see* AR 425, 619. These were specific and legitimate reasons to discount Dr. Stagner's

23  opinion, and the record supports them. *See Morgan*, 169 F.3d at 600-02 (inconsistencies with

other medical opinions and with activities of daily living are specific and legitimate reasons to discount medical opinion).

Mr. Smith contends that "his symptoms continued to wax and wane between 2005 and 2013," and that "the fact that Mr. Smith's symptoms waned at times is not a legitimate reason to reject Dr. Stagner's opinion." Dkt. 22, p. 4. "Cycles of improvement and debilitating symptoms are a common occurrence," and the Ninth Circuit has held that "in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working." *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014). But here the record does not indicate that Mr. Smith experienced only "isolated instances of improvement." *See id.* Rather, Mr. Smith's medical records dating to 2005 support the ALJ's finding that he received mostly unremarkable mental health evaluations. *See* AR 408-18, 427, 431, 439, 512-13, 525, 530, 536, 541; *see generally* AR 423-443 (Good Samaritan Behavioral Healthcare records, March 2005-August 2006, marking "[n]one" for "[r]elevant changes in medical condition and/or medications" at each visit), 475-543 (similar records for August 2006-July 2008). The record also supports the ALJ's finding that low points in Mr. Smith's mental-health history coincided with his being off medications and drinking alcohol again. AR 577-79; *see* AR 455, 462, 528-29, 1294-95, 1300. The record thus supports the ALJ's finding that Dr. Stagner offered his opinion at an atypical time. *See Attmore v. Colvin*, 827 F.3d 872, 877 (9th Cir. 2016) ("[T]he examples an ALJ chooses 'must *in fact* constitute examples of a broader development.'" [quoting *Garrison*, 759 F.3d at 1018]).

The ALJ's second reason is also legitimate and supported. Dr. Stagner opined that Mr. Smith was markedly limited in: relating appropriately to coworkers and supervisors, interacting appropriately in public, and responding appropriately to and tolerating the workplace pressures,

as well as learning new tasks and exercising judgment and making decisions. AR 319. But as the ALJ noted, the record shows that Mr. Smith worked part-time at construction sites, regularly attended Alcoholics Anonymous meetings, drove a car, played video game chess, bowled, and attended events at Sea-Fair. AR 583; *see* AR 425, 462, 482, 487, 503, 524, 543, 619. The record also shows that Mr. Smith read extensively, did jigsaw and crossword puzzles, and went to a tavern and a casino. AR 172, 347, 495, 504, 509, 517, 529, 532, 621, 1376. The record thus supported the ALJ's use of discretion in finding Mr. Smith's activities inconsistent with Dr. Stagner's report. *See Morgan*, 169 F.3d at 603.

B. Dr. Karakus

In May 2006, Dr. Sule Karakus opined that Mr. Smith was severely limited in his ability to interact appropriately in public and to respond appropriately to and tolerate the pressures and expectations of a normal work setting. AR 447. She also opined that Mr. Smith was markedly limited in his ability to exercise judgment and make decisions and relate appropriately to coworkers and supervisors. AR 447. She added that Mr. Smith needed to take his medications, would easily decompensate with pressures and frustrations, and suffered from loss of fine motor control and polyuria as a side effect of his medication, Depakote. AR 447.

The ALJ gave "very little weight" to Dr. Karakus's opinion. He reasoned that the opinion was "inconsistent with contemporaneous treatment records" and inconsistent with the doctor's own observations. AR 584. As with Dr. Stagner, the ALJ found that Dr. Karakus's findings that Mr. Smith was severely limited were inconsistent with Mr. Smith's activities. The ALJ noted that Dr. Karakus "did little to explain the basis of many of his [sic] findings." AR 584.

This reason was specific and legitimate, and substantial evidence supports it. In particular, the record supports the ALJ's finding that Dr. Karakus's opinions were inconsistent

with her own observations of Mr. Smith. Dr. Karakus met with Mr. Smith several times, both before and after the evaluation diagnosing him as acutely mentally ill and severely limited. *See* AR 447. She performed mental health status exams at each one, and none of those exams yielded abnormal findings. AR 408-18, 427, 431, 439, 512-13, 525, 530, 536, 541. Even Mr. Smith's subjective complaints at those meetings did not support Dr. Karakus's May 2006 diagnoses, as Mr. Smith mainly reported that he was "doing well," while a few times he reported mild depression and alcohol use. AR 427, 431, 439, 512-13, 525, 530, 536, 541. The ALJ thus did not err in determining that Dr. Karakus's opinion was inconsistent with her observations and in discounting her opinion as a result. *See Morgan*, 169 F.3d at 603.

C.    Dr. Opalenik

Dr. Andrea Opalenik diagnosed Mr. Smith on December 29, 2008 with right leg neuropathy, bilateral shoulder pain, and alcoholism. AR 547. She opined that Mr. Smith could stand and walk up to 6 hours per day and that his impairments would prevent him from working in a place where numbness in his right foot would risk him falling, from lifting or carrying over 10 pounds, from climbing or balancing, from doing more than occasional stooping, kneeling, crouching, and crawling, and from more than occasional reaching. AR 547-48.

Dr. Opalenik gave a different opinion of Smith's abilities the next day: that Mr. Smith could stand and walk only four hours per day (two without interruption) and was limited to occasionally lifting or carrying 11-20 pounds and frequently lifting or carrying 10 pounds, could not reach overhead, could not use foot controls, and could never climb, balance, stoop, kneel, crouch, or crawl, in addition to environmental restrictions. AR 549-53.

The ALJ gave "[s]ome weight" to Dr. Opalenik's opinion, finding that her clinical observations partially supported her opinions about Mr. Smith's limitations. AR 581. The ALJ

noted as examples that Mr. Smith smelling of alcohol supported limiting his exposure to hazards and that his limited range of motion and muscle weakness supported limiting his ability to lift and carry. AR 581. The ALJ explained, however, that he did not give greater weight to Dr. Opalenik's opinion because "there are various inconsistencies" between her two opinions "given only a day apart," and "portions of her opinion are inconsistent with her own observations or [Mr. Smith]'s activities." AR 581-82. He noted that while Dr. Opalenik opined that Mr. Smith could never use foot controls, the medical record showed him driving frequently and Dr. Opalenik herself "found no weakness or sensation loss in [his] left foot," and that her opinion that Mr. Smith could never climb ramps or stairs "appear extreme" given that she saw Mr. Smith climb on and off the exam table without trouble and that Mr. Smith worked part-time as a carpenter. AR 582; *see* AR 462, 487, 545, 551-53.

The ALJ did not err in giving only some weight to Dr. Opalenik's opinions. The inconsistencies between Dr. Opalenik's two evaluations, made just a day apart, are a legitimate reason to give those valuations less weight, and, as discussed above, the record shows those inconsistencies existed. AR 544-54; *see* AR 581-82; 20 C.F.R. § 404.1527(c)(4) (explaining that more weight should be afforded to medical opinions that are consistent with the record as a whole). As also noted above, the record supports the ALJ's conclusion that the severity of the limitations Dr. Opalenik assessed was inconsistent with her own observations and with Mr. Smith's activities. *See Morgan*, 169 F.3d at 600-02.

D.    Dr. Gaffield

Gary Gaffield, D.O., diagnosed Mr. Smith in April 2011 with "[l]ow back pain with a possible right radiculopathy," "[l]eft shoulder weakness with restricted motion," "[u]nexplained paresthesias in the fingers of the left hand," and "[m]ental issues." AR 1379. He opined that Mr.

Smith could walk or stand and sit for 6 to 8 hours in an 8-hour workday, lift 20 pounds occasionally and 10 pounds frequently, and frequently perform postural activities. AR 1379-80.

The ALJ assigned "[g]reat weight" to Dr. Gaffield's opinion, explaining that it was consistent with Dr. Gaffield's observations, testing, and medical imaging, with Mr. Smith's "various activities . . . , such as part-time carpentry work, driving, and moving a television," and with Mr. Smith's own admissions about his physical abilities. AR 583. The ALJ noted also that the later opinions of Dr. Charles Lee and Dr. Coral Hilby supported Dr. Gaffield's conclusions. AR 583; *see* AR 656-58, 690-91 (opining in May and August 2011, that Smith could stand or walk 6 hours per day, lift 20 pounds occasionally and 10 pounds frequently, and climb, balance, stoop, kneel, crouch, and crawl frequently).

These are specific and legitimate reasons for the ALJ to give greater weight to Dr. Gaffield's opinions, and the record supports them. *See* AR 487, 503, 1375; *Morgan*, 169 F.3d at 600-02. Although Mr. Smith asserts that those opinions were inconsistent with some of Dr. Gaffield's clinical findings, Dkt. 22, p. 13, he does not cite any such findings, and Dr. Gaffield's evaluation reveals none. AR 1375-80.

E.      Opinion Evidence from Other Sources

Mr. Smith also challenges the ALJ's consideration of opinions from professionals who are not "acceptable medical sources." To reject opinions from these sources, an ALJ must give "'reasons germane to each witness for doing so.'" *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (quoting *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1224 (9th Cir. 2010)).

First, Tadeus J. Doviak, Jr., M.A., met with and evaluated Mr. Smith in Mr. Smith's visits to Good Samaritan Behavioral Healthcare between 2005 and 2009. AR 355, 1237. In March 2008, he opined that Mr. Smith was markedly limited in his ability to learn new tasks,

ORDER - 11

exercise judgment and make decisions, and care for himself and moderately limited in his ability to perform routine tasks, relate appropriately to coworkers and supervisors, interact appropriately in public contacts, respond appropriately to and tolerate the pressures and expectations of a normal work setting, and control physical or motor movements and maintain appropriate behavior. AR 467. In January 2009, Mr. Doviak opined that Mr. Smith was "[n]ot able to work due to poor concentration [and] racing thoughts." AR 1249. Mr. Doviak observed that Mr. Smith showed expansive speech and affect, a depressed, angry, irritable, and guilty mood, and a tangential thought process. AR 1248. He also observed that Mr. Smith showed severe impairment of attention/concentration and judgment/insight, and moderate impairment of short- and long-term memory. AR 1247. He noted that Mr. Smith's appearance, behavior, and speech were unremarkable, however. He rated Mr. Smith's GAF at 31.[2] AR 1250. Mr. Doviak made similar observations in an August 2009 evaluation. AR 1237-41.[3]

The ALJ gave Mr. Doviak's March 2008 opinion "little weight," explaining that it was "inconsistent with many of [Mr. Doviak's] own observations in the treatment record," in which Mr. Smith "generally interacted socially appropriately and did not show significant cognitive deficits when taking medications as prescribed," and because Mr. Doviak "placed too much reliance on" Mr. Smith's complaints. AR 584. The ALJ also noted that Mr. Doviak's "evaluation did not include a mental status exam." AR 584. Although the ALJ cited Mr. Doviak's 2009

---

[2] A GAF score is "a subjective determination based on a scale of 100 to 1 of 'the [mental health] clinician's judgment of the individual's overall level of functioning.'" *Pisciotta v. Astrue*, 500 F.3d 1074, 1076 n.1 (10th Cir. 2007) (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed. 2000) at 32); *see also Vargas v. Lambert*, 159 F.3d 1161, 1164 n.2 (9th Cir. 1998) ("A GAF score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment."). "A GAF score of 31-40 is extremely low, and 'indicates . . . major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood.'" *Salazar v. Barnhart*, 468 F.3d 615, 624 n.4 (10th Cir. 2006) (quoting DSM-IV-TR at 32).

[3] An October 2009 evaluation that Mr. Smith points to merely recorded Mr. Smith's reports of his condition without making assessments. AR 1232.

ORDER - 12

observations in reviewing the medical record, he did not discuss the weight he gave the opinions Mr. Doviak expressed in those evaluations. *See* AR 578, 579.

The ALJ offered germane reasons to reject Mr. Doviak's 2008 opinion. Mr. Smith contends that the record contradicts the ALJ's conclusions because Mr. Smith's overall clinical record supported Mr. Doviak's conclusions. He cites the same pages in the record that he asserts contradict the ALJ's rejection of Dr. Karakus's opinion. Dkt. 22, pp. 6-7. As discussed above, those evaluations reflect mostly normal findings, with some fluctuations in Mr. Smith's reports on his mental state. AR 408-18, 427, 431, 439, 512-13, 525, 530, 536, 541.

Mr. Smith further contends that the ALJ erred in failing to discuss Mr. Doviak's other opinions. An ALJ does not need to discuss every piece of evidence in the record. *Howard ex rel. Wolff v. Barnhart*, 341 F.3d 1006, 1012 (9th Cir. 2003). Harmless error analysis applies to an ALJ's failure to discuss particular lay witness testimony. *Molina*, 674 F.3d at 1115-17. "[A]n ALJ's error is harmless where it is 'inconsequential to the ultimate nondisability determination.'" *Id.* at 1115 (quoting *Carmickle*, 533 F.3d at 1162). Among the factors this Court considers in determining harmlessness is "whether the evidence at issue was 'cumulative of other competent testimony.'" *Id.* at 1119 (quoting *Haddad v. Lockheed Cal. Corp.*, 720 F.2d 1454, 1460 (9th Cir. 1983)). Here, Mr. Smith does not contest the Commissioner's harmless error argument. *See* Dkt. 27, pp. 5-6. And as the above summaries reflect, Mr. Doviak's 2009 evaluations were cumulative of his March 2008 opinion, which the ALJ discussed and properly discounted. *See* AR 467, 1237-41, 1247; *Molina*, 674 F.3d at 1119. Thus, any error in not discussing Mr. Doviak's later opinions was inconsequential to the ALJ's nondisability determination and therefore harmless. *Molina*, 674 F.3d at 1115.

Second, in February 2011, Kathryn Shaw, ARNP, observed that Mr. Smith was tender to

palpation of the lumbar spine, had a positive straight leg raise on his right leg at 45 degrees, and showed a flat affect. AR 1374. She opined that Mr. Smith was limited to standing for 5 hours and sitting for 3 hours in an 8-hour day and lifting 10 pounds occasionally and 5 pounds frequently. AR 1369. She also opined that Mr. Smith needed frequent positional changes. AR 1370.

Noting that Ms. Shaw is not an "acceptable medical source," the ALJ assigned little weight to her opinion. He reasoned that nurse Ms. Shaw performed a less detailed examination than Dr. Gaffield; that her opinion was inconsistent with Dr. Gaffield's; that the lifting limitations she assessed were inconsistent with Mr. Smith's activities doing carpentry, house work, and yard work; and that her observations did not support the standing, walking, or sitting limitations she assessed. AR 582.

These were germane reasons, and the record supports them. *See Morgan*, 169 F.3d at 600-02. Ms. Shaw and Dr. Gaffield's respective evaluations support the ALJ's inference that Dr. Gaffield's was more thorough. AR 1269-74, 1375-80. Moreover, several aspects of Ms. Shaw's opinion were inconsistent with Dr. Gaffield's, including the amount of time Mr. Smith could spend standing and sitting and the weights he could lift occasionally and frequently. AR 1369, 1379-80. The ALJ thus offered a sufficient basis to discount Ms. Shaw's opinion.

II.     The ALJ's Assessment of Mr. Smith's Credibility

Questions of credibility are solely within the control of the ALJ. *Sample*, 694 F.2d at 642. The Court should not "second-guess" this credibility determination. *Allen*, 749 F.2d at 580. In addition, the Court may not reverse a credibility determination where that determination is based on contradictory or ambiguous evidence. *See id.* at 579. That some of the reasons for discrediting a claimant's testimony should properly be discounted does not render the ALJ's determination

ORDER - 14

invalid, as long as substantial evidence supports that determination. *Tonapetyan*, 242 F.3d at 1148.

An ALJ may not reject a claimant's subjective complaints solely because objective medical evidence does not support them. *See Byrnes v. Shalala*, 60 F.3d 639, 641-42 (9th Cir. 1995). Rather, the ALJ must provide "specific, cogent reasons for the disbelief." *Lester*, 81 F.3d at 834 (citation omitted). The ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Id.*; *see also Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993). Unless affirmative evidence shows the claimant is malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing." *Lester*, 81 F.2d at 834. A determination that a claimant's complaints are "inconsistent with clinical observations" can satisfy the clear and convincing requirement. *Morgan*, 169 F.3d at 600-02. But

In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other testimony that "appears less than candid." *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996). The ALJ also may consider a claimant's work record and observations of physicians and other third parties regarding the nature, onset, duration, and frequency of symptoms. *Id.*

At the 2008 hearing, Mr. Smith described debilitating pain in his back, leg, wrist, and foot, with pain from his back radiating into his foot. AR 34-35, 38-39. He said he had severe pain in his wrist when he pushed and that he took ibuprofen for his pain. AR 39. He also said that he suffered loss of fine motor control as a side effect of Depakote. AR 31-32, 38. In 2013, Mr. Smith testified that his impairments, both physical and mental, interfered with recreational activities. AR 620-21.

With respect to mental impairments, Mr. Smith also testified in 2008, that he experienced depression, mood swings, and low motivation. AR 29-30, 43. He stated that he tried to be a contractor but the paperwork created too much stress. AR 31. He said he was too inconsistent in arriving at work to keep a job. AR 34. He said that he had reported hearing voices in the past but had not been hearing them lately. AR 42. In 2013, Mr. Smith testified that he became manic after one or two months when he was not institutionalized or incarcerated. AR 614-15. He also said that he took medications only in a controlled environment and still cycled even when taking his medications. AR 615-16.

The ALJ found that Mr. Smith's statements about the intensity, persistence, and limiting effects of his physical impairments were not fully credible to the extent they were inconsistent with the RFC. AR 575. In particular, he found that Mr. Smith's statements about debilitating physical pain were inconsistent with the medical record. AR 575. He reasoned that Mr. Smith's refusal to accept pain relievers in 2005, and the conservative treatment he received while incarcerated in 2011, "indicate[d] that his physical symptoms were not as severe as he alleged." AR 575; *see* AR 227, 1436-64. And he found that Mr. Smith's assertions that his limitations kept him from working were inconsistent with Mr. Smith's activities. AR 576.

These were clear and convincing reasons for the ALJ to reject Mr. Smith's testimony to the extent it alleged debilitating physical symptoms. Substantial evidence supports the ALJ's finding that Mr. Smith's claimed physical limitations were inconsistent with his activities.

An ALJ may consider a claimant's daily activities to determine whether the claimant's symptom testimony is credible. *Smolen*, 80 F.3d at 1284. The ALJ may reject such testimony if the claimant "is able to spend a substantial part of his or her day performing household chores or other activities that are transferable to a work setting." *Id.* at 1284 n.7. The claimant need not be

"utterly incapacitated" to be eligible for disability benefits, however, and "many home activities may not be easily transferable to a work environment." *Id.*

Here, the evidence the ALJ cited concerning Mr. Smith's activities supports the inference that Mr. Smith can perform a full day of light work. AR 576, 580. Mr. Smith worked part time helping his son do carpentry work. AR 424, 484, 543. The ALJ noted that the work lasted several months in 2006 and encompassed multiple jobsites. A year later, Mr. Smith reported that he was working 32 hours per week. AR 503. Likewise, in 2008, he worked on another project and in 2011 he reported that he was working part-time and needed to avoid only heavy lifting. AR 467, 484, 1375. These activities are clearly "transferable to a work setting," and the record indicates that Mr. Smith spent a substantial part of the day doing them. *See Smolen*, 80 F.3d at 1284 n.7.

With respect to Mr. Smith's testimony about his mental impairments, the ALJ acknowledged and recounted a "bizarre incident" in 2005, when Mr. Smith took a machete to a public place "in protest of being restrained from going back to his home," and was subsequently placed in involuntary treatment for 90 days. AR 576; *see* AR 237, 245, 248, 314. The ALJ noted, though, that eventually "[w]ith medications [Mr. Smith's] agitation decreased, his manipulation decreased, and [his] condition became stable." AR 576; *see* AR 314-15. The ALJ found that subsequent "clinical observations indicate that [Mr. Smith] would be able to work within the above [RFC] when he manages his medications" and that those "observations are inconsistent with the degree of . . . low motivation, lack of focus, confusion, and anger" that Mr. Smith alleged. AR 576.

The ALJ cited evidence of Mr. Smith's mental state as shown in evaluations over the next several years, AR 577-79: He noted that Mr. Smith's discharge evaluation from Western State Hospital showed normal mental indicators, though Mr. Smith experienced some mild symptoms

later that month. AR 315 (Mr. Smith said he was happy and motivated to work), 357, 360-65. The ALJ found that while Mr. Smith experienced "temporary exacerbations" in 2006 and 2007 when he stopped taking his medications and resumed drinking alcohol, these "were only temporary and corrected when [Mr. Smith] began using medications again." AR 577; *see* AR 455, 462, 501-02, 527-28.

Reviewing the records from 2008, the ALJ reflected that Mr. Smith's diagnosis of intermittent explosive disorder appeared justified, but found on the whole that such episodes were atypical except when "there was an obstacle to [Mr. Smith] getting his medications, which often coincided with when he was first released from prison." AR 578; *see* AR 1294-95, 1300. The ALJ noted that Mr. Smith became agitated, delusional, and threatening when he again went off his medications and began drinking in April 2009 and again in March 2010. AR 578; *see* AR 1255, 1261, 1294-95, 1300. But, the ALJ also noted, Mr. Smith again improved with treatment. AR 578; *see* AR 1274-86. The ALJ noted that "even during periods of depression, [Mr. Smith] was generally not observed to have significant changes in his mental status." AR 579; *see* AR 1265-68. And he found, noting Mr. Smith's inconsistent reporting about his alcohol use, that Mr. Smith's "attempt to control information with respect to applying for benefits undermine[d] his credibility." AR 579; *see* AR 1011-20, 1338, 1349.

Where evidence "is susceptible to more than one rational interpretation," including one that supports the decision of the Commissioner, the Commissioner's conclusion "must be upheld." *Thomas*, 278 F.3d at 954. And when assessing a claimant's credibility, an ALJ may properly rely on "'unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment.'"[4] *Tommasetti*, 533 F.3d at 1039 (quoting *Smolen*, 80 F.3d at

---

[4] According to agency rules, "the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not

1284); *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). The ALJ interpreted Mr. Smith's health

records as showing his mental condition to be generally stable except when he failed to follow

his prescribed treatment. Although Mr. Smith argues for a different interpretation of the medical

record in this case, the ALJ's interpretation was rational. The inconsistency that the ALJ found

between the medical record and Mr. Smith's testimony in turn provided a clear and convincing

reason to discount that testimony to the extent it alleged debilitating mental symptoms. *See*

*Regennitter v. Commissioner of Social Sec. Admin.*, 166 F.3d 1294, 1297 (9th Cir. 1998).

III.    The ALJ's Evaluation of Lay Testimony

Lay testimony regarding a claimant's symptoms "is competent evidence that an ALJ must

take into account," unless the ALJ "expressly determines to disregard such testimony and gives

reasons germane to each witness for doing so." *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001).

In rejecting lay testimony, the ALJ need not cite the specific record as long as "arguably

germane reasons" for dismissing the testimony are noted, even though the ALJ does "not clearly

link his determination to those reasons," and substantial evidence supports the ALJ's decision.

*Id.* at 512.  The ALJ may also "draw inferences logically flowing from the evidence." *Sample*,

694 F.2d at 642

Mr. Smith's mother, Beverly J. Starr, submitted a function report about Mr. Smith's

symptoms in December 2005. Ms. Starr wrote that Mr. Smith had numerous impairments,

including tremors in his hands, an inability to maintain work because "homeowners are afraid of

the way he talks" and coworkers "are afraid of him and can't understand him," forgetfulness,

lack of focus, anxiety and confusion in performing everyday tasks like paying bills, difficulty

following the treatment as prescribed and there are no good reasons for this failure." Social Security Ruling (SSR)
96–7p. SSRs "do not carry the 'force of law,' but they are binding on ALJs nonetheless." *Bray v. Comm'r Soc. Sec.
Admin.*, 554 F.3d 1219, 1224 (9th Cir.2009). They "'reflect the official interpretation of the [SSA] and are entitled to
some deference as long as they are consistent with the Social Security Act and regulations.'" *Id.* (alteration in
original) (quoting *Avenetti v. Barnhart*, 456 F.3d 1122, 1124 (9th Cir.2006)).

following instructions, and that in general he "is paranoid, schizophrenic, manic, grandiose, delusional, and incoherent." AR 159-66; Dkt. 22, pp. 20-21.

The ALJ stated that Ms. Starr's observations are of "less value" because they were "largely inconsistent with the medical record as a whole." Tr. 589. He cited several examples of inconsistencies: Ms. Starr said Mr. Smith had no physical problems, but his medical records showed, and he argues, that he did; Ms. Starr said that Mr. Smith never drank alcohol or used drugs, though Mr. Smith reported in treatment that he began drinking at 15 years old; and that, while Ms. Starr said Mr. Smith experienced hand tremors, medical professionals generally did not observe these during treatment. AR 588-89. These are germane reasons to discount Ms. Starr's reports, and the record supports them. *See* AR 224 (history of shoulder pain and complaint of foot pain), 1349 (first drink at 15), 1407 (back pain).

In addition, Mr. Smith's former supervisor, Cheri Black, reported in a 2006 questionnaire about Mr. Smith's poor work performance for West Coast Vinyl from November 2004 to February 2005. AR 207, 209; Dkt. 22, p. 21. The ALJ discounted Ms. Black's testimony, too, because it pertained to a period predating Mr. Smith's alleged onset date and before Mr. Smith began taking medications. AR 589; *see also* AR 207 (period ended February 2005). The ALJ added that the skill level involved in the work Ms. Black described "appear[ed] to be well beyond the above [RFC]." AR 589; *see also* 208 (job duties description). These are germane reasons to discount Ms. Black's reports, and the record supports them. *Lewis*, 236 F.3d at 511. The ALJ did not err in addressing the lay evidence here.

IV.     The ALJ's Findings at Step Three

At step three of the Commissioner's sequential evaluation process, the ALJ must evaluate the claimant's impairments to see if they meet or medically equal any of the impairments listed

in 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R §§ 404.1520(d), 416.920(d); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

Mr. Smith presented testimony from Dr. Richard Johnson to show that his limitations satisfied the criteria in paragraph B or paragraph C of listing 12.04. Dr. Johnson opined that Mr. Smith's impairments probably met listing 12.04. AR 51-52.[5] The ALJ concluded at step three that Mr. Smith "does not have an impairment or combination of impairments that meets or medically equals the severity of" a listed impairment. AR 570. With respect to Mr. Smith's mental impairments, the ALJ discussed the "paragraph B" criteria and the evidence in the record that supported his decision to find those criteria were not satisfied. AR 570-71.

Mr. Smith's opening brief challenges the ALJ's step-three determination by pointing generally to Dr. Johnson's testimony, but it does not support that challenge with legal argument or citations to the record. Mr. Smith thus waived his challenge at step three. *See Carmickle*, 533 F.3d at 1161 n.2 (9th Cir. 2008).

V.     The ALJ's RFC Assessment

The Commissioner uses a claimant's residual functional capacity (RFC) assessment at step four of the five-step "sequential evaluation process" to determine whether he or she can do his or her past relevant work, and at step five to determine whether he or she can do other work. SSR 96-8p, 1996 WL 374184 *2.

The RFC is what the claimant "can still do despite his or her limitations." *Id.* A claimant's RFC is the maximum amount of work the claimant is able to perform based on all of the relevant evidence in the record. *Id.* However, an inability to work must result from the

---

[5] The ALJ did not discuss Dr. Johnson's assessment in his step three discussion but assigned it "some weight" at step four. AR 570-71, 585. He explained that he did not assign it greater weight because he found Dr. Johnson's assessment that Mr. Smith had a marked limitation in concentration, persistence, or pace to be inconsistent with the medical record. AR 585.

claimant's "physical or mental impairment(s)." *Id.* Thus, the ALJ must consider only those

limitations and restrictions "attributable to medically determinable impairments." *Id.* In assessing

a claimant's RFC, the ALJ must also discuss why the claimant's "symptom-related functional

limitations and restrictions can or cannot reasonably be accepted as consistent with the medical

or other evidence." *Id.* at *7.

The ALJ found Mr. Smith had the RFC

> **to perform light work as defined in 20 CFR 404.1567(b) and 416.977(b). The claimant can frequently climb ladders, ropes, scaffolds, ramps, and stairs. He can frequently balance, stoop, kneel, crouch, and crawl. He can occasionally reach overhead when using the left upper extremity. This individual is right-hand dominant. He should avoid concentrated exposure to hazards. The claimant can perform simple routine tasks that do not involve manufacturing style production rate or pace work. He can have occasional changes in the work setting. The claimant can be around coworkers but can have only superficial interaction with coworkers and no jobs that require a team effort. He can have superficial interaction with the public.**

AR 571-72 (emphasis in the original). The ALJ also found Mr. Smith could perform other jobs

existing in significant numbers in the national economy, based on the vocational expert's

testimony offered at the hearing in response to a hypothetical question concerning an individual

with the same age, education, work experience and RFC as Mr. Smith. AR 590-91.

Because, as discussed above, the ALJ did not make the errors Mr. Smith asserts in

considering the medical evidence, his testimony, or the testimony of lay witnesses, the ALJ's

RFC assessment completely and accurately describes his functional limitations. Accordingly, the

ALJ did not err in his RFC assessment. And because Mr. Smith bases his challenge to the ALJ's

step four and five findings entirely on alleged errors in the RFC determination, the ALJ did not

err at steps four or five.

## CONCLUSION

Based on the foregoing discussion, the Court finds the ALJ properly determined Mr. Smith to be not disabled. Defendant's decision to deny benefits therefore is AFFIRMED.

Dated this 14th day of June, 2017.

_Theresa L. Fricke_
Theresa L. Fricke
United States Magistrate Judge